IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Elizabeth D. Bourgeois, ) | |
| ) | Civil Action No. 6:08-2603-SB-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits (DIB) on March 8, 2004, alleging that she became unable to work on September 18, 2001 (subsequently amended to January 31, 2004).  The application was denied initially and on reconsideration by the Social Security Administration.  On May 2, 2005, the plaintiff requested a hearing.  The administrative law judge, before whom the plaintiff, her attorney,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

and a vocational expert appeared on July 10, 2006, considered the case *de novo*, and on September 14, 2006, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on May 21, 2008.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)    The claimant meets the insured status requirements of the Social Security Act through September 30, 2008.

(2)    The claimant has not engaged in substantial gainful activity since January 31, 2004, the amended alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.).

(3)    The claimant has the following severe impairments: degenerative disc disease and left carpal tunnel syndrome. (20 CFR 404.1520(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently; alternate sitting and standing at the worksite at approximately 30 minute intervals; not involved in climbing of ropes, ladders or scaffolds, balancing, kneeling, or crawling; she can occasionally climb ramps or stairs with hand rails, stoop and crouch; she needs to avoid exposure to vibration at the worksite; she can perform occasional fingering with the left dominant hand, and perform only simple, routine work.

(6)    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7)    The claimant was born on April 10, 1962 and was 39 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563).

(8)     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

(9)     Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568).

(10)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

(11)     The claimant has not been under a "disability," as defined in the Social Security Act, from January 31, 2004 through the date of this decision (20 CFR 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of

3

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

4

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff, who was born in April of 1962, was 44 years old at the time of the ALJ's decision. She completed the ninth grade (Tr. 278) and worked most recently selling furniture at a store she owned and operated with her husband (Tr. 268-69). The plaintiff initially alleged disability beginning September 18, 2001, due to degenerative disc disease, arthritis, cervical fusion, swelling, cardio-narrowing of the arteries, chronic pain, fibromyalgia, and depression (Tr. 59); but amended her alleged disability onset date to January 31, 2004, at the hearing (Tr. 266).

*Medical Evidence*

**Prior to the alleged onset date**

The record reveals that on April 18, 2003, the plaintiff was admitted to Tuomey Healthcare System for right shoulder, neck, and arm pain. An MRI showed degenerative disc disease of the cervical spine with a disc protrusion at C6-7, causing slight compression of the spinal cord on the right side. An x-ray of the shoulder was negative. On physical examination, the plaintiff was in no acute distress, had minimal decreased

range of motion in her neck, and a Spurling test was positive. The attending physician prescribed pain management, including prednisone and Vicodin, and recommended followup with Dr. Thomas Holbrook (Tr. 115-17, 122-23, 204-05).

On May 1, 2003, Dr. Holbrook performed a diskectomy with fusion at C6-7 (Tr. 126-27).

On June 9, 2003, Dr. Holbrook noted excellent relief from radicular pain following the diskectomy and released the plaintiff from routine neurosurgical follow-up. He recorded that the plaintiff experienced "a little bit of soreness in the cervical paraspinous muscles but this [wa]s steadily improving" (Tr. 138).

An MRI on July 23, 2003, showed good anatomical alignment with no evidence of disc herniation or significant compromise of the central canal. The MRI also revealed posterior spondylitic changes at C5-6 (Tr. 144-45). Dr. Holbrook read the MRI as showing satisfactory appearance without evidence of nerve root or spinal cord compression (Tr. 137).

The plaintiff presented to Dr. Holbrook on August 14, 2003, with right shoulder and arm pain from a plasterboard falling on the back of her head. She indicated that she had been doing well after surgery until the new accident. In addition to right shoulder and arm pain, the plaintiff complained of worsening lower back pain radiating in her thighs. The plaintiff had a satisfactory range of motion in her cervical spine without significant increase in discomfort with movement. She also demonstrated some decreased sensation to pinprick in her right hand and mild weakness in her right triceps. Dr. Holbrook recommended continuing with prescription Ultram and Soma, trying some ibuprofen, and pursuing physical therapy. His notes indicated that the plaintiff's insurance would not cover the physical therapy, so she preferred to use "some heat on her own at home (Tr. 136).

**After the alleged onset date**

The plaintiff presented to Dr. Kurt Stroebel in February and March 2004. She reported hip and low back pain, primarily on the left side. She denied any specific injuries and complained of pain when getting up from a seated position or lying down. On physical examination, Dr. Stroebel found the plaintiff had no pain with passive range of motion in the hip, but had difficulty with forward flexion of the lumbosacral spine and side bending. Dr. Stroebel diagnosed low back pain with trochanteric bursitis and recommended physical therapy (Tr. 165-66).

In March, Dr. Stroebel diagnosed mechanical low back pain and referred the plaintiff to a spine doctor (Tr. 164).

In March 2004, the plaintiff presented to the emergency room at Tuomey Healthcare System with chest pain, dizziness, and vomiting. Her heart rate and rhythm were regular, without murmurs, gallops, or rubs. After chest x-rays and an EKG, the doctor determined that the cause was not cardiac-related, but was more likely musculoskeletal or gastrointestinal in etiology. He recommended that the plaintiff continue her present medications and follow up with her primary care doctor (Tr. 158-59).

On April 21, 2004, the plaintiff presented to orthopaedist Dr. Dewey Ervin complaining of low back pain since November 2003. Dr. Ervin diagnosed mild degenerative disease of the lumbosacral spine and encouraged the plaintiff to pursue physical therapy. He concluded that there was no indication for operative treatment and referred her for pain management (Tr. 225-27).

On September 10, 2004, Dr. Charles G. Shissias diagnosed left carpal tunnel syndrome following upper extremity nerve conduction studies. He recommended a wrist splint and medication for her left hand. He also indicated that if the plaintiff did not respond to these interventions, a carpal release surgery should be considered. While the nerve conduction studies were performed on the right and left extremities, Dr. Shissias did not

7

provide any conclusions or recommendations regarding the plaintiff's right arm and hand (Tr. 169).

On September 16, 2004, the plaintiff saw Dr. Ervin complaining of low back pain.  Specifically, she reported "pain in both posterior lateral thighs and radiation of pain to the plantar aspect of her left heel" (Tr. 224).

On October 16, 2004, Dr. Ervin prescribed a short course of corticosteroid and encouraged the plaintiff to use symptomatic treatment including a heating pad, hot baths or showers, bed rest, etc. (Tr. 224).

The plaintiff returned to Dr. Ervin on October 18, 2004, reporting continued back pain with radiculopathy in the S-1 distribution of the left lower extremity.  She reported only a mild amount of relief from the cortisone and had not pursued pain management because her insurance would not cover it.   Dr. Ervin recommended an MRI of the lumbosacral spine (Tr. 224).

On October 20, 2004, Dr. Ervin reported that the MRI showed "[r]ight L4-5 neural foraminal enhancement suggestive of scar tissue around the exiting nerve root . . . moderately advanced degenerative disc changes at the lumbosacral junction with mild bilateral neural foraminal narrowing as a result of broad-based disc bulge without significant impingement upon the exiting nerve roots."  Dr. Ervin noted no change in the plaintiff's low back symptoms, and he again reassured the plaintiff that there was no indication for operative treatment.  He recommended the plaintiff see Dr. Hugh Thompson, another colleague at Pee Dee Orthopaedics, and suggested that she consider epidural steroid injections (Tr. 223).

On December 27, 2004, the plaintiff presented at McLeod Regional Medical Center complaining of back pain.  She was given pain medication and directed to follow up with her private physician or back specialist (Tr. 173).

Two days later, the plaintiff returned to Dr. Ervin. She had not seen Dr. Thompson as scheduled because of her insurance coverage. Dr. Ervin again emphasized the need for the plaintiff to see Dr. Thompson for evaluation (Tr. 222).

On January 28, 2005, state agency psychologist Edward Waller, Ph.D., completed a Psychiatric Review Technique form, in which he concluded that the plaintiff's mental impairments were not severe. He opined that the plaintiff had no limitations on her activities of daily living and had not experienced episodes of decompensation. He indicated that she had mild limitations in maintaining social functioning and maintaining concentration, persistence, and pace (Tr. 241-54).

On March 14, 2005, Dr. Forrest Pommerenke examined the plaintiff at the request of the Commissioner. He noted that the plaintiff still had stitches from an abdominoplasty (tummy tuck) on February 23, 2005, and therefore may have had reduced ability to perform during the physical examination (Tr. 184). He diagnosed degenerative disc disease, mild coronary artery disease, and carpal tunnel syndrome (Tr. 186-87). He stated that the plaintiff's degenerative disk disease was of "moderate to severe nature" and "prognosis is very guarded in future" (Tr. 186).

State agency physician Dr. James Weston completed a residual functional capacity assessment on March 29, 2005, in which he opined that the plaintiff could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds; stand or walk for six hours during an eight-hour day; and sit for six hours during an eight-hour day. Dr. Weston concluded that the plaintiff should limit climbing, balancing, stooping, kneeling, crouching, and crawling to occasionally (Tr. 233-40).

The plaintiff returned to Dr. Ervin on May 23, 2005, for follow-up on her low back symptoms. The plaintiff indicated to Dr. Ervin that she saw Dr. George Bitting in

February 2005[2] and he recommended epidural steroid injections.  X-rays indicated "almost complete obliteration of the L-5, S-1 disc space."  Dr. Ervin noted that the plaintiff had significant back discomfort and "constant pain" in both feet.  He recommended that the plaintiff see his partner, Dr. Bill Edwards, for evaluation and treatment (Tr. 222).

Dr. Bill Edwards, Jr., evaluated the plaintiff on July 7, 2005.  He read her x-rays as showing degenerative changes but no compressive pathology.  He diagnosed lumbar spondylosis status post-diskectomy and found no evidence of herniated nucleus pulposus.[3]  Dr. Edwards indicated that a "salvage effort arthrodesis could be offered but at her relatively young age I would try to avoid this if possible"; the salvage intervention could provide some improvements in her mechanical symptoms.  He also emphasized to the plaintiff the general good natural history of continued conservative treatment for degenerative disc disease (Tr. 220-21).

Nearly one year later, on July 5, 2006, Dr. Tim Parnell reviewed an MRI of the plaintiff's lumbar spine.  His impression was post-surgical changes with scarring rightward at L4-5 with scar tissues surrounding the right nerve root in the right lateral recess; no evidence of left-sided nerve root impingement (Tr. 263).

### Plaintiff's Statements and Testimony

The plaintiff testified that she lived with her husband and 14-year-old daughter (Tr. 267-68).  She last worked, selling furniture, in September 2001 (Tr. 271-72).  She testified that she stopped working because she fell down and re-injured her back (Tr. 271-72).  The plaintiff reported that her biggest medical problems were her back and neck pain

---

[2]There are no treatment notes in the record documenting the plaintiff's visit to Dr. Bitting.

[3]Herniated nucleus pulposus is also known as lumbar radiculopathy or a slipped disc. *See Medline Plus* at http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm.

and carpal tunnel syndrome in her left, dominant hand (Tr. 275).  She testified that she had good relief from her back and neck surgeries in 2001 and 2003 (Tr. 273, 275).  She stated that the doctor told her to "hold off as long as possible" on back surgery (Tr. 283).  With regard to her carpal tunnel syndrome, the plaintiff indicated that she stopped wearing the splint on her left hand because it caused her hand to go numb; she reported doing better now without the splint (Tr. 276).  The plaintiff also testified that the nerve in her right hand, between her index and middle fingers "pulls" (Tr. 277).  She reported that this was the result of nerve damage, for which she took medication (Tr. 277-78).  She indicated that the weakness in her right hand was "not very significant" (Tr. 287).  The plaintiff testified that she did not experience side effects from her medications, Ultram and Flexeril (Tr. 281). She reported that she was diabetic and used insulin to control her diabetes (Tr. 280).

The plaintiff testified that the most she can lift is a gallon of milk or five pounds of sugar (Tr. 283).  She indicated that 30 minutes is the longest period of time she can stand, sit, or walk before experiencing pain (Tr. 285-86).  The plaintiff was able to drive short distances (Tr. 279), for about 20-30 minutes (Tr. 83).  She testified that she hired someone to clean her home; but she washes dishes and cooks dinner for her family (Tr. 290).

### Vocational Testimony

The ALJ asked Mary Cornelius, a vocational expert, to assume a hypothetical person of the plaintiff's age, education level, and work experience who could lift 20 pounds occasionally and 10 pounds frequently; needs to alternate between sitting and standing at approximately 30-minute intervals; must avoid climbing ladders, ropes, or scaffolds; must avoid kneeling or crawling; must limit climbing ramps and stairs, balancing, stooping, and crouching to occasionally; must avoid exposure to vibration; cannot perform repetitive fingering with her left dominant hand; and is limited to simple, routine tasks (Tr. 296-99).

11

Ms. Cornelius testified that such a person could work as a cost rate clerk,[4] call-out operator,[5] and charge account clerk.[6]

## ANALYSIS

The plaintiff initially alleged disability beginning September 18, 2001, but amended her alleged disability onset date to January 31, 2004, at the hearing (Tr. 266). She was 41 years of age on her amended onset date (Tr. 111). The plaintiff has a ninth-grade education and past relevant work experience as a furniture salesperson (Tr. 268-69). The ALJ found that the plaintiff has the residual functional capacity ("RFC") to lift and carry up to 20 pounds occasionally and 10 pounds frequently; alternate sitting and standing at the worksite at approximately 30-minute intervals; not involved in climbing or ropes, ladders or scaffolds, balancing, kneeling, or crawling; she can occasionally climb ramps or stairs with hands rails, stoop and crouch; she needs to avoid exposure to vibration at the worksite; she can perform occasional fingering with the left dominant hand and perform only simple, routine work (Tr. 23). The plaintiff argues that the ALJ erred by (1) failing to consider all of her severe impairments; (2) failing to properly determine her RFC; (3) requiring physical evidence of her chronic pain; (4) requiring evidence of emergency room or hospital treatment to prove the presence and severity of her chronic pain; (5) failing to propound a correct hypothetical question to the vocational expert; and (6) relying on inaccurate vocational expert testimony in finding that she was not disabled.

---

[4]*Dictionary of Occupational Titles*, # 237.367-046.

[5]*Dictionary of Occupational Titles*, # 237-367.014.

[6]*Dictionary of Occupational Titles*, # 205.367-014.

### Severe Impairments

The plaintiff first alleges that the ALJ erred by finding that only her degenerative disc disease and carpal tunnel syndrome were severe impairments. She claims that the ALJ erred by failing to find that her chronic pain, uncontrolled diabetes, venous insufficiency, and paresthesias caused by diabetes were also severe impairments (pl. brief 15).

An impairment is severe when it is more than a slight abnormality that has more than a minimal effect on the ability to do basic work activities. *See* Social Security Ruling (SSR) 96-3p; 20 C.F.R. §§ 404.1520(a), 404.1521; *see also, e.g., Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (citations and internal punctuation omitted).

The ALJ found as follows as to the plaintiff's diabetes:

> The claimant's diabetes is controlled with medication and there is no evidence of medical related significant complications fo the claimant's diabetes. I find no objective medical evidence substantiating greater than minimal effect on her ability to function. Accordingly, the claimant's diabetes is not a "severe" impairment within the meaning of the Social Security Act.

(Tr. 22).

In August 2004, Dr. Whaley noted that the plaintiff's right arm was drawing up, and she had paresthesia in her fingers. He stated that he would refer the plaintiff to a neurologist (Tr. 195). In September 2004, Dr. Shissias, the neurologist who saw the plaintiff on Dr. Whaley's referral, noted that the plaintiff had bilateral upper extremity paresthesias along with right hand numbness and decreased right touch pin prick in right hand only. The plaintiff reported paresthetic discomfort in the arms bilaterally. Dr. Shissias recommended an EMG with nerve conduction study of the bilateral upper extremities (Tr. 172). Further, Dr. Whaley's notes from an office visit in January 2006 show that the plaintiff had tingling and sensitivity in her feet and fingers. The doctor's assessment was paresthesia caused by diabetes (Tr. 262). The defendant argues that the plaintiff's diabetes was well controlled

13

and had no more than a minimal effect on her work abilities.  However, given that the ALJ did not consider the above cited evidence of a complication of the plaintiff's diabetes, it does not appear that the ALJ's finding was based upon substantial evidence.  Further, it appears that the diabetes and paresthesia should have been considered severe impairments.

The plaintiff also contends that the ALJ erred by failing to consider her venous insufficiency as a severe impairment.  However, the plaintiff has failed to point to any evidence showing that the venous insufficiency had more than a minimal effect on her ability to do basic work activity.  Further, while the ALJ did not consider the plaintiff's chronic pain as a severe impairment separate from her degenerative disc disease and carpal tunnel syndrome, he did consider the plaintiff's pain as will be discussed below.

The plaintiff also mentions her depression and fibromyalgia in her allegations of error by the ALJ (pl. brief 1).  The plaintiff does not mention these impairments in the body of her brief (pl. brief 15-16), and she has cited no evidence showing that depression had more than a minimal effect on her ability to do basic work activities.  Further, the consultative examiner found that the plaintiff's depression was not severe (Tr. 241).  The plaintiff's treating physician, Dr. Whaley, noted in December 2002 that the plaintiff had "ongoing problems with . . . fibromyalgia" (Tr. 201).  In October 2004, Dr. Whaley noted, "fibromyalgia - refer to [rheumatologist] in [Columbia] at her request" (Tr. 194).  The ALJ did not discuss this diagnosis or any possible limitations resulting from the fibromyalgia.

Accordingly, upon remand, the ALJ should be instructed to consider the plaintiff's diabetes and paresthesia as severe impairments.  Further, the ALJ should be instructed to consider the evidence of fibromyalgia at step two of the sequential evaluation process.

***Residual Functional Capacity***

The plaintiff next argues that the ALJ failed to consider all of her impairments in assessing her RFC.

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.
> . . .

SSR 96-8p, 1996 WL 374184, *7.

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling.  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974).  The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity.  *Id*.  The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed.  *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

As discussed above, the ALJ failed to properly consider the plaintiff's diabetes, paresthesias, and fibromyalgia at step two of the sequential evaluation process.

15

The ALJ should be further instructed to consider all of the plaintiff's impairments, both severe and nonsevere, in determining the plaintiff's RFC.

### Chronic Pain

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

16

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the
individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any
medication the individual takes or has taken to alleviate
pain or other symptoms;

(5)    treatment, other than medication, the individual receives
or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses
or has used to relieve pain or other symptoms (e.g., lying
flat on his or her back, standing for 15 to 20 minutes
every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional
limitations and restrictions due to pain or other
symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found as follows with regard to the plaintiff's subjective complaints:

After considering the evidence of record, I find that the
claimant's medically determinable impairments could
reasonably be expected to produce the alleged symptoms, but
that the claimant's statements concerning the intensity, duration
and limiting effects of these symptoms are not entirely credible.
The claimant has discontinued wearing her wrist splint and has
not required surgery for her left carpal tunnel syndrome. She
has low back and neck pain and intermittent joint tenderness
but she does not demonstrate strength deficits, circulatory
compromise, neurological deficits, muscle spasms,
fasciculations, fibrillations, or muscle atrophy or dystrophy,
which are often associated with long-standing, severe or
intense pain and physical inactivity. She has responded well to
treatment without significant adverse side effects and without
necessity for intensive, inpatient care or frequent emergency
treatments. She reports activities to include cleaning the
house, light cooking and grocery shopping. These activities are
indicative of a fairly active and varied lifestyle.

(Tr. 24).

17

The Commissioner's regulations and rulings state that a claimant who would otherwise be found disabled, but fails without justifiable cause to follow treatment prescribed by a treating source which the Agency determines can be expected to restore the claimant's ability to work, cannot by virtue of such "failure" be found to be disabled.  *See* 20 C.F.R. §§ 404.1530, 416.930.  The Agency may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:  (1) the evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity; (2) the impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; (3) treatment which is clearly expected to restore capacity to engage in any substantial gainful activity has been prescribed by a treating source; and (4) the evidence indicates that there has been a refusal to follow prescribed treatment.   "When the [Agency] makes a determination 'failure,' a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.  SSR 82-59, 1982 WL 31384, at *1.

Social Security Ruling 96-7p provides:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility. For example:
>
> * The individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. The individual may be living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medications.

18

* The individual's symptoms may not be severe enough to prompt the individual to seek ongoing medical attention or may be relieved with over-the-counter medications.

* The individual may not take prescription medication because the side effects are less tolerable than the symptoms.

* The individual may be unable to afford treatment and may not have access to free or low-cost medical services.

* The individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual.

* Medical treatment may be contrary to the teaching and tenets of the individual's religion.

96-7p, 1996 WL 374186, at **7-8.

Here, the ALJ found that the fact the plaintiff "discontinued wearing her wrist splint" weighed against her credibility (Tr. 24). The ALJ apparently did not consider "any explanations that the [plaintiff] may provide" for her failure to wear her wrist splint. At the hearing, the plaintiff testified that the wrist splint made her hand go numb and her wrist did better without it (Tr. 276). There was also evidence that the plaintiff had not pursued pain management, physical therapy, and office visits with other specialists because her insurance would not cover it (Tr. 136, 222, 224). Upon remand, the ALJ should be instructed to make the required analysis before drawing any inferences as to the plaintiff's credibility.

The plaintiff argues that the ALJ erred by requiring physical evidence of her chronic pain. As argued by the plaintiff, claims of disabling pain may not be rejected "solely because the available objective evidence does not substantiate [the claimant's] statements" as to the severity and persistence of her pain. 20 C.F.R. § 404.1529(c)(2); *see also Foster v. Heckler*, 780 F.2d 1125, 1129 (4th Cir. 1986) ("[T]here need not be objective evidence of the pain itself or its intensity."). Here, the ALJ appears to have relied heavily on the lack of

objective findings substantiating the plaintiff's subjective complaints in evaluating her credibility.

The plaintiff also argues that the ALJ erred by requiring evidence of the necessity to seek emergency room or hospital treatment to prove the presence and severity of her chronic pain. This court agrees. Furthermore, the ALJ failed to note that the medical evidence shows that the plaintiff required emergency treatment at least twice following her amended alleged onset date.

Based upon the foregoing, upon remand, the ALJ should be instructed to evaluate the plaintiff's subjective complaints in accordance with the above-cited law.

### *Vocational Expert Testimony*

The plaintiff argues that the ALJ failed to include all of her impairments in the hypothetical question to the vocational expert. "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). As discussed above, the ALJ failed to consider all of the plaintiff's impairments, both severe and nonsevere, in his RFC assessment. The ALJ must then include all of the plaintiff's impairments in the hypothetical question to the vocational expert.

The ALJ's hypothetical provided for an individual who "cannot perform repetitive fingering with her left dominant hand." The plaintiff argues that the ALJ failed to include all of her limitations from the carpal tunnel syndrome, which includes impairment of the use of her fingers, hands, and arms. Also, the plaintiff argues that the ALJ did not include any limitations from the nerve damage to her right hand resulting from the herniated disc in her cervical spine. This court agrees. As discussed above, the medical evidence shows that the plaintiff suffered from bilateral upper extremity paresthesias and right hand

20

numbness.  Upon remand, the ALJ should be instructed to offer a proper hypothetical question that includes all of the plaintiff's impairments, including impairment of manual dexterity.

The plaintiff further argues that the vocational expert was not accurate in the jobs she identified.  In response to the hypothetical by the ALJ, the vocational expert testified that such a person could work as a cost rate clerk, call-out operator, and charge account clerk.  The plaintiff cites specific issues with the vocational expert's testimony:  (1) the job of telephone quotation clerk (referred to as a "cost rate clerk" by the ALJ) requires frequent fingering in opposition to the hypothetical that limited her to occasional fingering; (2) the general educational development ("GED") requirements exceed her education level and (3) the job descriptions "clearly" are not simple, routine tasks.  As stated above, "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Walker*, 889 F.2d at 50 (citation omitted).  Here, the ALJ failed to include all of the plaintiff's impairments in the hypothetical question.  Accordingly, the vocational expert's testimony here is irrelevant.  Upon remand, the ALJ should be instructed to obtain further vocational expert testimony as to the existence of jobs available in the national economy that the plaintiff can perform despite the existence of her impairments.

### Treating Physicians

In the conclusion of her brief, the plaintiff argues in passing that the ALJ "erred in failing to give sufficient weight to the opinion of Dr. Erwin and Dr. Edwards" (pl. brief 27).  On May 23, 2005, Dr. Dewey Ervin, who treated the plaintiff at Pee Dee Orthopaedic Associates, diagnosed the plaintiff with "mild degenerative disease lumbosacral spine."  He stated in pertinent part as follows:  "The patient has significant back discomfort.  I do feel

21

that the patient is significantly debilitated secondary to her pain from this.  She also has 'constant pain' in both feet" (Tr. 222).  Dr. Ervin referred the plaintiff to his partner, Dr. Bill Edwards, for evaluation and treatment recommendations (Tr. 220, 222).  Dr. Edwards stated as follows after evaluating the plaintiff on July 7, 1005:

> There is a salvage effort that arthrodesis could be offered but at her relatively young age I would try to avoid this if possible. She understands that any salvage surgical intervention could not be expected to alleviate all her symptoms but it would be hopeful that some improvement in her mechanical symptoms might be noted.  The general good natural history of continued conservative treatment for degenerative disc disease was also emphasized to her.

(Tr. 221).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case.  *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions.  These are administrative findings reserved for the Commissioner's determination.  SSR 96-2p.  Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors:  (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in

which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

The ALJ cited Dr. Edwards' opinion, although he mistakenly attributed it to Dr. Ervin (Tr. 23). He did not comment on Dr. Edward's opinion that arthrodisis would be a "salvage effort." The ALJ did not mention Dr. Ervin's opinion that the plaintiff was "significantly debilitated secondary to her pain" at all. Upon remand, the ALJ should be instructed to evaluate the opinions of Drs. Ervin and Edwards in accordance with the above-cited law.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

July 9, 2009                                    s/William M. Catoe
Greenville, South Carolina                      United States Magistrate Judge

23